IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 DEC 20  PM 4:07

U.S. DISTRICT COURT
N.D. OF ALABAMA

SANDY SKURSTENIS,                    )
                                     )
     Plaintiff,                      )
                                     )        CIVIL ACTION NO.
v.                                   )
                                     )        98-AR-2295-S
SHERIFF JAMES JONES, et al.,         )
                                     )
     Defendants.                     )
                                     )

**ENTERED**

**DEC 20 1999**

### MEMORANDUM OPINION

Presently before the court is a motion for summary judgment filed
by defendants, James Jones, Sheriff of Shelby County, Alabama ("the
Sheriff"), Wayne Watts, a captain in the Sheriff's office ("Watts"),
Jason Smitherman, an officer in the Sheriff's office ("Smitherman"),
and Stacey Blankenship, an officer in the Sheriff's office
("Blankenship").  All are sued under 42 U.S.C. § 1983, as individuals
and not in their official capacities.  Defendants seek judgment as a
matter of law on all claims asserted against them by plaintiff, Sandy
Skurstenis ("Skurstenis").  Skurstenis claims that her Fourth Amendment
and Fourteenth Amendment rights were violated, first by a strip-search
to which she was subjected while she was being admitted to the Shelby
County Jail, and second, by a crotch search for lice just before her

1



release.  Skurstenis appends not unexpected state law claims.  For the reasons hereinafter discussed, defendants' motion will be granted in part and denied in part.

### Background

On May 8, 1998, an officer in the Sheriff's office, not a defendant here, arrested Skurstenis for driving under the influence of alcohol.  A .38 special handgun with an expired permit was found on the floorboard of Skurstenis' car.  After an intoxilyzer reflected a blood alcohol level of .18, Skurstenis was taken to the Shelby County Jail, where, because of her degree of intoxication, she was required to stay overnight.  She was told that she could have someone pick her up the next day at 11:00 a.m.  She does not complain about her arrest or about her overnight stay.  She does complain vociferously about what happened to her while she was in custody.

After being booked, Skurstenis was taken to a restroom adjacent to the booking area by Blankenship, a female officer. Skurstenis was told to disrobe, to turn and face the wall, and to squat and cough.  This procedure arguably constitutes a relatively mild form of body cavity search, but it is nevertheless unpleasant. How a woman as inebriated as Skurstenis allegedly could squat without toppling is a scientific question worthy of exploration at

2

some other time and place.  Skurstenis was next given a jail uniform, was walked by defendant Smitherman through an area where other female inmates were sleeping, and was placed in a solitary cell.  This was Smitherman's only contact with Skurstenis.

At approximately 10:30 a.m., after having spent the night "sleeping it off," Skurstenis was instructed to go to the infirmary, where she found three female inmates and a male in jeans and a t-shirt.  Skurstenis did not know who the man was or what his position was.  He wore no badge or other identification.  He has since been identified as T.O. Richey, an employee of Shelby Baptist Medical Center ("Shelby Baptist").  Strangely, he was never made a defendant.  Shelby Baptist had a contract with the Sheriff to perform certain medical services in relation to the jail inmates.  A copy of the contract is conspicuously absent from the record.  The court cannot know who, if anybody, might be helped or hurt by the terms of that contract.

Richey asked the other persons in the room to leave.  He then informed Skurstenis that, pursuant to Shelby County law, he was required to run some tests on her.  This court is unaware of any difference between the law of Shelby County, Alabama, and the law of Alabama generally, insofar as the law that governs the situation in which Richey and Skurstenis found themselves.  Richey took a

3

blood sample from Skurstenis and then told her to stand up in front of him and to pull down her pants so that he could check her for "crabs." She pulled her pants down below her pubic hair, whereupon Richey ran his fingers back and forth through her pubic hair eight or ten times, looking for lice. A short period of time later Skurstenis was booked out and left the jail with her husband.

### Discussion

Skurstenis was searched twice, each time for a different purpose. In this suit she claims that each search constituted a constitutional deprivation.

### Strip-Search Upon Entry Into Jail

Skurstenis first claims that her Fourth Amendment protection against unreasonable search was violated when she was strip-searched upon entry into the jail. That search was performed pursuant to the Sheriff's policy of strip-searching **all** detainees, regardless of any individualized suspicion, whenever a detainee was to be "intermingled" with the jail's general population. Both the brief submitted by plaintiff and the brief submitted by defendants refer to policies and procedures of the "Shelby County Jail." The Shelby County Jail is, in fact and in law, **the Sheriff** himself.

In defining the contours of the Fourth Amendment, the Supreme Court held in *Terry v. Ohio*:

4

> [W]herever an individual may harbor a reasonable
> expectation of privacy, he [or she] is entitled to be
> free from unreasonable governmental intrusion.  Of
> course, the specific content and incidents of this right
> must be shaped by the context in which it is asserted.
> For what the Constitution forbids is not all searches and
> seizures, but unreasonable searches and seizures.

*Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, (1968)(internal
quotations and citations omitted).

In *Bell v. Wolfish*, the Supreme Court applied the *Terry*

principles in a prison context as follows:

> The test of reasonableness under the Fourth Amendment is
> not capable of precise definition or mechanical
> application.  In each case it requires a balancing of the
> need for the particular search against the invasion of
> personal rights that the search entails. Courts must
> consider the scope of the particular intrusion, the
> manner in which it is conducted, the justification for
> initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884 (1979).

Earlier in the *Bell* opinion the Court had acknowledged:

> The fact of confinement as well as the legitimate goals
> and policies of the penal institution limits [any]
> retained constitutional rights.
>
> *  *  *
>
> Prison administrators therefore should be accorded
> wide-ranging deference in the adoption and execution of
> policies and practices that in their judgment are needed
> to preserve internal order and discipline and to maintain
> institutional security.

*Id*. at 546-47, 99 S.Ct. at 1878.

5

Looking at the evidence under defendants' Rule 56, F. R. Civ. P., motion, the court must give plaintiff the benefit of the doubt on the facts. Skurstenis is entitled to any fair interpretation of the evidence, including all of its favorable nuances. The court must examine the search at issue here to check its reasonableness under the totality of the circumstances.

In the Eleventh Circuit and elsewhere the law of strip-search is surprisingly undeveloped, considering the invasiveness of the procedure and the frequency of its occurrence. There is precious little helpful precedent. Nonetheless, the court will address the cases that provide whatever guidance there is, comparing the facts of those cases with the facts of the Skurstenis case.

In *Bell*, quoted *supra*, all pre-trial detainees were required to expose their body cavities for visual inspection as part of an automatic strip-search conducted after every contact with a person from outside the penal institution before detainees could be returned to the general population. The Supreme Court balanced the prison's security concerns against the invasion of an individual's privacy, and concluded that a strip-search can be conducted on less than probable cause. *Id*. at 560, 99 S.Ct. at 1885. The *Bell* court also found that the search there being reviewed was justified not

6

only because weapons or contraband might be discovered by such a
routine, but because such a search might deter prisoners from
attempting to smuggle contraband into the jail. *Id.* at 558, 99
S.Ct. at 1884.

While *Bell* is helpful in certain respects, several of its
important facts are different from those here. The main difference
is that Skurstenis had no contact with anyone "outside the
institution" after she was arrested, something essential to the
decision in *Bell*. Skurstenis was stopped by the police as she was
leaving a convenience store. She failed her field sobriety test
and was arrested, without any need whatsoever for an exercise of
force. She was not out of law enforcement supervision from the
first moment she was approached by the arresting officer, until her
eventual release. She did not meet with any "visitor," nor did she
have any opportunity to acquire or to hide a weapon or other
contraband. *See Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir.
1983). The only reason she might have had for hiding contraband is
that before she left home and began to imbibe, she had decided to
secrete contraband in a body cavity anticipating that she might be
arrested and want the contraband in jail. Hardly a likely
scenario. In balancing the security needs of the institution

7

against the privacy rights of the individual, it is very difficult, if not impossible, to justify the extreme invasion of Skurstenis' privacy on the infinitesimal possibility of finding contraband. The circumstances of the present case are quite different from the situation in *Bell*, where the inmate was searched after meeting a visitor who had time to plan a smuggling attempt. Moreover, as to the deterrent value, the lesson to be taught Skurstenis, if that was the Sheriff's purpose, was too cruel a lesson, as well as an unnecessary lesson under the circumstances. The purpose of a body cavity search should not be to teach women generally not to hide contraband in their body cavities before shopping at convenience stores while under the influence of alcohol. "Cookie-cutter" justice may be "equal" justice, but it is not always real justice. To enforce an invariable rule of strip-searching all detainees booked into jail, because of its alleged deterrent effect, is, in the opinion of this court, taking an otherwise tolerable idea beyond its logical limits. *See Giles,* 746 F.2d at 617.

There is another crucial difference between this particular detainee and the detainee in *Bell*. The inmate in *Bell* was truly **intermingled** with the jail's "general population." Here, Skurstenis was due to be released the next morning. She was held

8

for the night in **solitary**.  She had no physical contact with other inmates.  She was introduced into the "general population" only to the extent that she was escorted by a prison official to her single-occupant cell through an area where other female prisoners were sleeping.  This was not enough contact to provide the Sheriff with a legitimate basis for contending that Skurstenis was introduced into the "general population."   This is a real and substantive difference between Skurstenis' situation and that in *Bell*.

The lack of intermingling with the general population is not a minor distinguishing feature.  On virtually identical facts, except for the lack of "intermingling" with the "general population," the Fourth Circuit found a strip-search to be unconstitutional.  The Fourth Circuit held:

> [T]he strip search policy promulgated by Sheriff Clements and enforced by his department was conclusively shown to be unconstitutional under the standards laid out in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447. . . . On the undisputed and stipulated evidence, Logan's strip search bore no such discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified. **At no time would Logan or similar detainees be intermingled with the general jail population;** her offense, though not a minor traffic offense, was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; there was no cause

9

in her specific case to believe that she might possess
either. . . . An indiscriminate strip search policy
routinely applied to detainees such as Logan along with
all other detainees cannot be constitutionally justified
simply on the basis of administrative ease in attending
to security considerations.

*Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981)(emphasis
added).

The subsequent procedural history of *Logan* is as instructive
as its above quoted language.  The Supreme Court was asked to stay
the mandate of the Fourth Circuit.  Justice Rehnquist, the author
of *Bell*, acting in his capacity as Circuit Justice, issued a
temporary stay pending consideration of the application for stay by
the full Court.  *Clements v. Logan*, 454 U.S. 1304, 102 S.Ct. 284.
In issuing his stay, the future Chief Justice found that the Fourth
Circuit, while purporting to apply the standards of *Bell*, failed to
consider "the central objective of prison administration,
safeguarding institutional security."  *Id*. at 1310, 102 S.Ct. at
288.  Justice Rehnquist, who spoke only for himself, said:

The clear import of [the Fourth Circuit's] decision is
that strip-searches may not be conducted without probable
cause to believe that the subject of the search possesses
weapons or contraband. No such requirement attended the
search policy upheld in *Bell v. Wolfish*, and indeed the
Court expressly held that strip-searches need not be
conditioned on probable cause. *Id*., at 560, 99 S.Ct., at
1884. Nor was the result in *Bell v. Wolfish* predicated on
a showing that searches were limited to those persons
whose alleged offenses were "commonly associated by

10

> [their] very nature with the possession of weapons or
> contraband." 660 F.2d, at 1013. In short, the Court of
> Appeals decision reads as if *Bell v. Wolfish* had never
> been decided.

*Clements v. Logan*, 454 U.S. at 1310, 102 S.Ct. at 288.

Upon consideration by the full Supreme Court, Justice Rehnquist's
stay was vacated. *Clements v. Logan*, 454 U.S. 1117, 102 S.Ct.
961, (U.S.Va. Dec 11, 1981). Later, when the original *Logan v.
Shealy* was brought up on application for *writ of certiorari*, the
writ was denied. Justice Rehnquist's expressions may or may not
reflect what the present Supreme Court would say under the same or
similar circumstances, but what he said in granting a temporary
stay is not binding precedent.

If defendants here mean only to argue that strip-searches
without "probable cause" are **sometimes** permissible, this court
cannot disagree. But a line must be drawn. It is drawn here
against the Sheriff by holding that strip-searches are not
permissible without "probable cause" when a non-felony detainee is
held without being "intermingled with the general population."

An additional aspect of the Skurstenis situation troubles this
court greatly and calls for the drawing of another line. If there
were doubt on the other grounds discussed, an additional fact would
tip the balance against the Sheriff on the question of the

11

reasonableness of his strip-search of Skurstenis.    The Sheriff
concedes that **only female** detainees in Skurstenis' position were
subjected to strip-searches.    When males were brought in on a DUI
and are required to "sleep it off," they were provided with a
holding cell outside the "general population" and were not required
to undergo a strip-search.    This court has no reason to doubt the
Sheriff when he explains that his overcrowded jail simply has "no
space available . . . to hold intoxicated female inmates without
housing them in [what the Sheriff refers to as] the general
population."    Nonetheless, this disparate treatment of the sexes
gives pause to any thinking person.    We are taught that under the
Equal Protection Clause of the Fourteenth Amendment, "[p]arties who
seek to defend gender-based government action must demonstrate an
'exceedingly persuasive justification' for that action."    *U.S. v.
Virginia*, 518 U.S. 515, 531, 116 S.Ct. 2264, 2274 (1996).    Although
the instant case is not an Equal Protection case, the Fourth and
the Fourteenth amendments become inexorably linked under the unique
set of facts in this case.

The court credits the Sheriff's argument that his was not a
"gender-based government action," and, instead, was one based on
the physical realities arising from the fact of limited resources.

12

The court understands the Sheriff's problem, but cannot accept such a facile answer for what happened here. This court believes that a way could have been found within the Sheriff's fiscal and physical constraints to provide equal treatment to the sexes insofar as their being exposed to strip-searches in the Shelby County Jail. Strip-searches are universally regarded as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Justice v. City of Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992). Neither males nor females should be singled out for such a degrading experience. The court agrees with the following portion of Judge Posner's dissent in *Johnson v. Phelan*, a case dealing with a male pretrial detainee's § 1983 action seeking damages based on the fact that female guards had monitored him while he was naked:

> There are different ways to look upon the inmates of prisons and jails in the United States in 1995. One way is to look upon them as members of a different species, indeed as a type of vermin, devoid of human dignity and entitled to no respect. . . I do not myself consider the 1.5 million inmates of American prisons and jails in that light. . . .[W]e should have a realistic conception of the composition of the prison and jail population before deciding that they are a scum entitled to nothing better than what a vengeful populace and a resource-starved penal system choose to give them. We must not exaggerate the distance between "us," the lawful ones, the respectable ones, and the prison and jail population; for

> such exaggeration will make it too easy for us to deny
> that population the rudiments of humane consideration.

*Johnson v. Phelan*, 69 F.3d 144, 151-52 (7th Cir. 1995)(Posner, J.,
dissenting).

*Justice v. City of Peachtree City*, 961 F.2d 188, 192
(11th Cir. 1992), is the only Eleventh Circuit opinion that
provides any guidance for this case. At least it is the only such
decision found by this court. There, a municipality enacted a drug
and alcohol abuse plan calling for increased vehicle stops with
emphasis on teenage drug offenders. Pursuant to the plan, a police
officer pulled into a church parking lot to investigate two parked
cars. The cars attempted to leave. The officer recognized one of
the cars as belonging to a sixteen-year-old male. The officer
pulled him over. As the officer approached the car, he saw the boy
give something to his passenger, a fourteen-year-old girl. Upon
determining that the teenagers were truants, the officer arranged
for a juvenile officer to come to the church parking lot. Both
teenagers were arrested and taken to the police station. There, an
officer directed two female officers to strip-search the juvenile
female. No contraband was found. The juvenile female sued the
city and the officers in their individual and official capacities,
challenging the constitutionality of the strip-search. The
Eleventh Circuit determined that the officers had "reasonable

14

suspicion" that the girl was carrying contraband.   The Eleventh

Circuit considered the totality of the circumstances and found:

> [L]aw enforcement officers may subject a juvenile who is
> lawfully in custody to a strip search based on reasonable
> suspicion that the juvenile is concealing a weapon or
> contraband, when the strip search is conducted in the
> least intrusive manner, even when the juvenile is in
> custody after being arrested for an offense that is not
> a felony.

*Id.* at 189.

*Peachtree City* became the focus of a subsequent case in the

Middle District of Alabama.   Chief Judge Albritton considered

*Peachtree City*'s requirement that there be at least "reasonable

suspicion" before a strip-search.  He wrote:

> Plaintiffs have asked this court to hold the searches
> unconstitutional because the Defendants had no probable
> cause or reasonable suspicion for the search.   In
> *Peachtree City*, the Eleventh Circuit appears to place
> some emphasis on the idea that the officer had
> 'reasonable suspicion' for the search. . . .   It is not
> certain from a fair reading of the opinion whether this
> requirement is present only because the case involved a
> juvenile arrestee.   Indeed, given that the juvenile in
> that case was not going to be placed in a cell, *Peachtree*
> is not exactly persuasive authority on this issue.   In
> any event, however, this court will not read the Eleventh
> Circuit's decision to require that some heightened
> justification be present for a jail official to search a
> new inmate before they are placed in lockup with other
> prisoners.

*Magill v. Lee County*, 990 F.Supp. 1382, 1390 (M.D.Ala.1998), aff'd
161 F.3d 22 (11th Cir.(Ala.) Sept. 30, 1998).(Table, No. 98-6144).

The Skurstenis case is quickly distinguishable from *Magill*. In *Magill* the new inmates were to be "intermingled" with the "general population." As already discussed *ad nauseam*, Skurstenis was not "intermingled" in the way the word "intermingled" is used in the cases. With respect to the "reasonable suspicion" question, this court does not reach the same conclusion that Judge Albritton reached on his set of facts. As far as this court can tell, the Eleventh Circuit in *Peachtree City* gave no indication that it required "reasonable suspicion" only where a juvenile is involved. Rather, the *Peachtree City* court held:

> The *Bell* balancing test for reasonableness requires at a minimum, that the facts upon which an intrusion is based be capable of measurement against an objective standard, whether this be probable cause or a less stringent test. Courts which have considered the strip search issue have applied objective standards ranging from reasonable suspicion to probable cause. *See, e.g., Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984) (holding that arrestees for minor offenses may be subjected to a strip search only if jail officials have reasonable suspicion to believe that arrestees are concealing weapons or contraband), cert. denied, 471 U.S. 1053, 105 S.Ct. 2114, (1985); *Tinetti v. Wittke*, 620 F.2d 160 (7th Cir.1980), aff'g, 479 F.Supp. 486 (E.D.Wis.1979) (holding that arrestees for minor offenses may be subjected to a strip search only if jail officials have probable cause to believe that arrestees are concealing weapons or contraband).

> \* \* \*

> Due to the extremely intrusive nature of a strip search,

16

> strip searches of arrestees based on less than probable
> cause have only been upheld where such searches were
> necessary to protect the overriding security needs of the
> institution--that is, where officials have a reasonable
> suspicion that a particular detainee harbors weapons or
> dangerous contraband. *Fuller v. M.G. Jewelry,* 950 F.2d
> 1437, 1447 (9th Cir.1991).

*Peachtree City*, 961 F.2d at 192-93 (internal quotations omitted).

The Eleventh Circuit's words give no indication that the court is

applying its holdings only to juveniles, and none of the three

cases it cited with approval involved a juvenile.    In fact,

*Peachtree City* expressly says that the "security dangers to the

institution are the same whether the detainee is a juvenile or an

adult."    If the Eleventh Circuit wishes to elaborate upon its

expressions in *Peachtree City* or to revisit the issues discussed in

that case, it will do so in its own good time.

This court has taken perhaps too much time attempting to

explain its conclusion that the objective need for a strip-search

under some circumstances cannot justify subjecting Skurstenis and

other similarly situated female detainees to a strip-search without

"reasonable suspicion" of something that might prompt such a

search.

Defendants argue that, even if the first search of Skurstenis

was unconstitutional, they are entitled to "qualified immunity."

17

With this proposition the court reluctantly agrees. As the Eleventh Circuit has held, "[u]nless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994). Although this court finds that this strip-search was unconstitutional, the Sheriff had no compelling reason to reach the same conclusion before the strip-search. He certainly had no reason to analyze the prior jurisprudence as this court has just done.

A two-step analysis is required to determine whether a public actor is entitled to qualified immunity in a § 1983 case. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). The first inquiry is whether the government official was acting within the scope of discretionary authority. This element is conceded in the present case. The burden, therefore, was placed on plaintiff to prove that some target defendant violated "clearly established" law. *Id.* With respect to this second element, the court agrees with defendants Blankenship and Jones that at the time of the first search to which they were parties there was no "clearly

established" law in this circuit adequately describing the contours of constitutionally permissible strip-searches. While this court finds that this particular strip-search was, in fact and law, unconstitutional, the law on the subject was, and still is, so undeveloped in this circuit that the court cannot say that "only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter*, 28 F.3d at 1149.

The court wonders aloud whether its solo conclusion that what the Sheriff did here upon plaintiff's entry into the Shelby County Jail was unconstitutional will "clearly establish" anything for the future. A district court opinion, even if it is published, only binds the parties. It probably will not "establish the law" for any jailer except, perhaps, the Sheriff of Shelby County until the Eleventh Circuit agrees or disagrees. This is a good enough reason to hope that the Eleventh Circuit will take this case on interlocutory appeal and will expand upon the approach it recently took in *Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999). If the Eleventh Circuit considers an appeal by Skurstenis of this court's finding of qualified immunity for the Sheriff and Blankenship against her Fourth Amendment objection to the first search while considering the Sheriff's anticipated appeal from the denial of his

19

claim of qualified immunity as to the later lice inspection, the parties in this case, and other in cases just around the corner, should be grateful.

The court finds that the defendants who had any connection with the strip-search conducted upon entry into the jail are qualifiedly immune.  The other defendants are entitled to summary judgment because they had no connection at all to that search. Therefore, summary judgment for Jones, Watts, Smitherman,[1] and Blankenship, constituting all defendants, will be granted as to the strip-search upon entry into the jail.

### The Inspection To Prevent Lice From Escaping From the Jail

If the second aspect of this case constitutes a viable Fourth Amendment claim, the "reasonableness" of the last minute inspection for lice is to be judged by the same standard upon which the strip-search upon entry into the jail was judged.   It is entirely possible that because the presence of a louse cannot prove criminal conduct, there is no Fourth Amendment implication in searching for a louse.  The Fourth Amendment was designed by the authors of the Bill of Rights as a limitation on governmental searches for, and

---

[1]The court takes particular notice of the fact that Smitherman's total involvement in this case is that he escorted Skurstenis to her holding cell for the night. The naming of Smitherman as a defendant borders on the frivolous.

seizures of, possible incriminating evidence or contraband.  As an alternative to the Fourth Amendment as a basis for plaintiff's § 1983 complaint about the lice inspection, Skurstenis invokes the Fourteenth Amendment's guarantee of due process, which, in this case would have to refer to "substantive" due process.[2]  Defendants urge the court to analyze this second claim, like the first claim, only under the Fourth Amendment.  This court is not sure of what category of potential constitutional violation an unknown male's search for lice in a female's pubic hair fits into, if it fits into any constitutional category, but the court is positive in its disagreement with defendants' hopeful assertion that plaintiff has no avenue of constitutional attack.  One or both of plaintiff's theories get her somewhere, which is the gist of the rest of this opinion.

If this is a Fourth Amendment case, *Bell* requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails.  Richey was, after all,

---

[2] As the Eleventh Circuit recently observed: "The substantive element of the Due Process Clause protects those rights that are 'fundamental'--rights that are 'implicit in the concept of ordered liberty.' The Supreme Court has deemed that most, but not all, of the rights enumerated in the Bill of Rights are fundamental. Certain unenumerated rights, such as the right to privacy, also merit protection." *Skinner v. City of Miami, Fla.*, 62 F.3d 344, 347 (11th Cir. 1995) (internal citations omitted).

21

"searching" for lice, even if only as a matter of public sanitation. Courts must consider the scope of a particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884. As the *Peachtree City* court observed:

> The *Bell* balancing test for reasonableness requires at a minimum, that the facts upon which an intrusion is based be capable of measurement against an objective standard, whether this be probable cause or a less stringent test.

*Peachtree City*, 961 F.2d at 192 (internal citations and quotations omitted).

In the present case, the physical touching and inspection of the exposed pelvic region of a female non-felony detainee was conducted by an unidentified male dressed in blue jeans and a t-shirt. He was "searching" for things that are neither weapons nor other forms of contraband, with no "probable cause" in the traditional sense, and no reasonable suspicion of wrongdoing by the person being inspected. Arguably, there is always a suspicion that a louse may be present in the pubic hair of a person.

This particular intrusion on Skurstenis' privacy cannot hold up to measurement by any objective standard, either under Fourth Amendment analysis or under Fourteenth Amendment substantive due

process analysis.  There was simply no legitimate basis for this
pelvic inspection, which becomes absolutely uncivilized when
conducted by an unknown male.  At the time of her release,
Skurstenis was hardly about to **introduce** lice into the jail.  The
test for the reasonableness of any "search" requires a balancing of
the **need** for the particular search against the **invasion** of personal
rights.  Skurstenis was in the process of leaving the jail when she
was required to expose herself to a hands-on search by a male.
Because the invasion of her privacy was extreme, this "search"
fails the reasonableness test by, as another court has described
it, "two and a half country miles."  *See, e.g., Peachtree City*, 961
F.2d at 193.

Defendants have anticipated this court's criticisms of the
lousy search with three arguments.  First, they contend that this
"search" was reasonable because lice infestations are a serious
problem at this jail.  Second, defendants argue that this search,
even if unreasonable, was not attributable to the Sheriff because
his only policy was that lice "searches" be carried out.  He says
that the Shelby Baptist Medical Center actually performed the
searches and determined how they were to be conducted.   Third,
defendants argue that even if such "searches" are found to be

23

unconstitutional and are attributable to the Sheriff, he and his employees are protected by qualified immunity.

With respect to defendants' first argument, the seriousness of the lice problem cannot justify a search that occurs minutes before a detainee is to be released. Any lice that might have made it into the jail with the detainee will have already made it. The object of a search of a detainee on the way out surely cannot be to keep lice from **escaping** from the jail. If the Sheriff is responsible to the outside populace not to let a louse loose, such is not a compelling enough public health obligation to justify a hands-on pubic hair search of a female detainee by an unknown male moments before her discharge. Having this "crab" check performed by an unidentified male in blue jeans and a t-shirt was bound to increase the distress suffered by Skurstenis, without providing any measureable improvement in public sanitation. Any competent jailer should understand the importance of having searches performed by same-sex jail staff members. In fact, in this jail's own policy on Search At Time Of Admission, Policy Number B-103, this point is made twice, both at the original pat-down stage and at the "complete search" stage. "Complete search" is the jail's euphemism for "strip-search." All strip-searches are required to be performed by a "same sex jail staff member." In the lice

24

inspection under consideration here, if it was a "search" for Fourth Amendment purposes, as defendants seem to concede, there was no excuse for an unidentified male in jeans and a t-shirt to run his fingers through plaintiff's pubic hair eight to ten times. The gross unconscionability of this "search" is, or should be, self-evident.

The fact that what happened here may have been an aberrational occurrence does not insulate the Sheriff from § 1983 liability. The Sheriff's argument that if this particular lice search was unreasonable, it cannot be attributed to him because he did not establish the procedure for the search, which was actually performed by Shelby Baptist in accordance with policies and procedures devised by it, is rejected by this court. The Alabama Code provides:

> The sheriff has the legal custody and charge of the jail in his county and all prisoners committed thereto, except in cases otherwise provided by law, and may appoint a jailer for whose acts he is civilly responsible.

Alabama Code, § 14-6-1.

This statute obviates the applicability of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978), by establishing that a sheriff in Alabama is the decision maker and policy maker for the jail population and is the

ultimately responsible party.   A sheriff has more than mere custody.   He controls every movement of a prisoner, every meal, every inspection, every aspect of prison existence.   It is difficult to comprehend, much less to agree with, the Sheriff's contention here that he can physically hand a prisoner over to an independent contractor and immunize himself from § 1983 liability for what thereafter happens to that person.   The Sheriff wisely does not try to argue *Monell*.   Eleventh Circuit law confirms the inability of the Sheriff to abdicate his statutory responsibility. That court said:

> The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. . . This duty is not absolved by contracting with an entity such as Prison Health Services. Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service. In that sense, the county's duty is non-delegable.

*Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).

Although *Ancata* is a medical care case and not a search case, the principle is the same, namely, that an entity that is legally responsible for the custody of a prisoner cannot get rid of that

26

responsibility by contract.[3]

Finally, the Sheriff argues, as he successfully did with respect to the strip-search upon entry, that even if he did violate Skurstenis' constitutional rights in the lice inspection, he is shielded by qualified immunity. He points out that there is no decision by the Supreme Court or from the Eleventh Circuit forbidding what Skurstenis here complains of, namely, the search of a woman's pubic hair for lice by a man in a t-shirt moments before the woman departs the jail. He does not add the fact of the detainee's ethnicity or day of the week when the inspection occurred. The Sheriff says that without unambiguous prior instructions from the Eleventh Circuit, or from the Supreme Court, he could not have been expected to know that his prospective action was unconstitutional. This court has already speculated that a lower federal court's very graphic and detailed published opinion probably would not constitute an effective warning for qualified immunity purposes. But, what if the Supreme Court of Alabama had written a very detailed "red flag" opinion in a prior § 1983 case,

---

[3]Only Sheriff Jones and Captain Watts are named as defendants with respect to the second search during which the lice inspection occurred, so Officers Blankenship and Smitherman are not involved. The court finds that under Alabama Code § 14-6-1, it is the Sheriff who is given responsibility for the legal custody of the detainees, not Captain Watts, and it is the Sheriff who is responsible for policy, not Captain Watts. Accordingly, with respect to all claims against Captain Watts relating to the lice search, summary judgment is due to be granted.

warning Alabama sheriffs not to do what this sheriff did to Skurstenis? After all, state courts have concurrent jurisdiction with federal courts over § 1983 cases. If before the subject event the Supreme Court of Alabama had issued a sharp reprimand to a sheriff for having allowed a male to conduct a lice search of a female shortly before she departed from his jail, could a reasonable Alabama sheriff ignore that warning with impunity and obtain qualified immunity in a subsequent identical situation? Fortunately, this is only a hypothetical question. The Eleventh Circuit has held that "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violated federal law in the circumstances." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994). The Eleventh Circuit suggests that public officials need only be familiar with the published opinions of their particular federal Circuit Court of Appeals and the opinions of the Supreme Court of the United States. And everybody knows, ostensibly even sheriffs, that an **unpublished** opinion by the Eleventh Circuit on an identical set of facts would have no precedential value.

The necessity of a virtually identical set of facts is emphasized by the Eleventh Circuit. In *Harbert Intern., Inc. v. James*, 157 F.3d 1271 (11th Cir. 1998), the Eleventh Circuit made clear that a **general** principle of constitutional law, no matter how well anticipated and understood, cannot substitute for precise precedential instruction. The Eleventh Circuit put it this way:

> Because [plaintiff] has pointed to no factually analogous case which establishes that the defendants' conduct was a deprivation of property without due process of law, it has failed to discharge its burden [of proving that the unconstitutionality of the act is clearly established].

*Id.* at 1285.

If Skurstenis must meet this unattainable standard in order to avoid the Sheriff's qualified immunity defense, she loses. This court has combed the books looking for a case sufficiently like this one to constitute that unmistakable "red flag" and cannot find such a case either by the Eleventh Circuit or by the Supreme Court. Could this be because no male jailer has ever thought that he could get away with checking an exiting female's pubic hair for "crabs"?

The availability of qualified immunity for what the Sheriff allowed here cannot turn on the ability of the Sheriff to have found an Eleventh Circuit case or a Supreme Court case just like this one before the unfortunate event took place. When a violation

of a fundamental right is so obvious that no half-way intelligent
public official could conclude in good faith that his proposed
action is constitutional, a public official who does it anyway
cannot claim qualified immunity.  In such a scenario, qualified
immunity is surrendered, notwithstanding the absence of "all-fours"
pre-existing, binding precedent.  This rather obvious concept was
very well expressed by Judge Black in her special concurrence in
*Gonzalez v. Lee County Housing Authority,* 161 F.3d 1290, 1311 (11th
Cir. 1998), as follows:

> The purpose of qualified immunity is to protect
> government officials from liability for conduct they
> could not reasonably have known was unlawful. Much of
> federal constitutional law and statutory law is
> unpredictable and unclear in its application to
> particular circumstances. Thus, as the Court states, we
> require materially similar case law or a very specific
> statute before saying that a government official should
> have known her conduct was unlawful. [FN3] There is no
> specific pre-existing case law applicable to this case.
> FN3. See Opinion at 1301 ("Ordinarily, a plaintiff who
> seeks to overcome a state official's affirmative defense
> of qualified immunity must cite case law, in force at the
> time of the defendant's actions, that would have made it
> absolutely clear that the defendant's conduct violated
> federal law [and] we have acknowledged the possibility
> that some federal statutory provisions will be
> sufficiently clear on their own to provide defendants
> with fair notice of their obligations under the law.").
> On the other hand, we have recognized that in the
> extremely rare case a government official's conduct may
> be so egregious, in fact evil, as to be obviously
> contrary to federal law, so that no case law or statute
> needs to have recognized previously that materially
> similar conduct is unlawful. The facts alleged here, if

true, make this that extremely rare case.

*Id.* at 1311.

In a recent § 1983 case, *Martin v. Baugh*, Appeal No. 96-6111 (unpublished), the Eleventh Circuit found that this court committed error when it concluded that an earlier Eleventh Circuit decision had "clearly established" that the particular conduct there under scrutiny was protected by the First Amendment from interference by a supervisory public official. The *Baugh* court found that the case which had been cited by this court, namely *Martinez v. City of Opa-Locka*, 971 F.2d 708 (11th Cir. 1992), was not "**sufficiently similar**" to the fact situation in *Baugh* to constitute an effective warning to a First Amendment violator that he must not punish a whistle-blowing subordinate. If a pre-existing earlier Eleventh Circuit holding on absolutely indistinguishable facts is necessary before a person acting under color of law can be stripped of his qualified immunity, this court hesitates to mention two foreign precedents that are, in this court's opinion, "sufficiently similar" to the instant case to have provided fair warning to the Sheriff here, if he had read them. In *Doe v. Renfrew*, 631 F.2d 91 (7th Cir. 1980), the Seventh Circuit found that the strip-search of a 13-year-old female student was improper, even without prior

Seventh Circuit precedent directly on point.  The Seventh Circuit,

without employing Judge Black's rationale from *Gonzales*, found it

to be impossible to find qualified immunity.  In *Draper v. Walsh*,

790 F.Supp. 1553 (W.D. Okla. 1991), a district court found that a

detainee could not be subjected to a visual strip-search after a

minor traffic violation, again, because no good faith was possible

under the circumstances.  These two cases are just as likely to

have been studied by the Sheriff of Shelby County before this

particular incident as the Sheriff was likely to have studied

similar opinions by the Eleventh Circuit if any had existed.  These

preceding precedents from the Seventh Circuit and the District

Court for the Western District of Oklahoma, would, under Eleventh

Circuit precedent, not have constituted effective warnings to the

Sheriff here not to allow a male to conduct a crotch examination of

a female inmate minutes before her release from custody, but what

these courts said in *Renfrew* and *Draper* do illustrate that anybody

with walking around sense would know not to do what the Sheriff did

here.   Justice Potter Stewart, when discussing his inability

precisely to define pornography, observed: "I know it when I see

it."   *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct.

1676, 1683 (1964)(Stewart, J. concurring).  Similarly, this court

32

is unable precisely to explain what constitutes the constitutionally proscribed conduct that Judge Black was describing in *Gonzales*, 161 F.3d at 1311, without "all fours" precedent, but even without such precedent, this court "know[s] it when [it] see[s] it." And this court sees it in this case. A reasonable sheriff could not possibly in good faith believe that what the Sheriff did or failed to do vis-a-vis Skurstenis just before she left the jail was constitutionally permissible. And this is true whether the conduct is evaluated under Fourth Amendment scrutiny or under Fourteenth Amendment scrutiny.

### State Law Claims

Alabama grants sovereign immunity to its executive officers in Article I, Section 14 of the Alabama Constitution of 1901. Section 14 states that "the State of Alabama shall never be made a defendant in any court of law or equity." Both sheriffs and deputy sheriffs are considered executive officers of the state, immune from suit under Section 14. *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996). Alabama law affords Section 14 immunity to state officers whether sued in their official capacities or in their individual capacities. *McMillian v. Johnson*, 101 F.3d 1363, 1365 (11th Cir. 1996). Accordingly, summary judgment on all state law

claims, as to all defendants, will be granted. Richey, who was not a state official, would have been a good target for plaintiff's state law claims for outrage and invasion of privacy, but he was not sued.

### Fourteenth Amendment Claims

As stated, plaintiff's claim of a violation of her rights under the Fourteenth Amendment can only be a claim that her right to "**substantive**" due process was violated. She makes no attempt to describe a denial of "procedural" due process. The Supreme Court has held that where an enumerated constitutional right specifically applies to a claimed violation, that claim should be looked at only as a possible violation of the enumerated right and not as a matter of substantive due process. For example, in a Fourth Amendment case, where the claim was an allegedly illegal seizure, the Supreme Court held: "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989). Here, the claim involving the body search upon plaintiff's entry into the jail can be examined only under the Fourth Amendment. While this court believes that

34

that search was unconstitutional, the court has already held that the involved defendants enjoy qualified immunity because of an absence of "sufficiently similar" precedent.

The "search" for lice has been analyzed both as a Fourth Amendment violation and as a Fourteenth Amendment violation. Under either of these constitutional approaches, or under both of them, there was a violation of plaintiff's constitutional rights, and there is no qualified immunity because of the obviousness of the violation.

### Conclusion

A separate and appropriate order in conformity with the foregoing opinion will be entered. Because the Sheriff should, and undoubtedly will, appeal from the denial of qualified immunity as to the lice inspection, and because this court could be wrong in granting him qualified immunity with respect to the initial strip-search, the court will certify that ruling under 28 U.S.C. § 1292(b) for an application by Skurstenis to the Eleventh Circuit for interlocutory appeal.

DONE this 20th day of December, 1999.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

35